EICHHORN v. CENTRAL R. R. OF NEW JERSEY.

(Circuit Court, S. D. New York. March 3, 1911.)

1. MASTER AND SERVANT (§ 117*)—SAFETY OF PREMISES—NEGLIGENCE.

It was negligent to turn off lights in a railway freight depot while an employé was walking along a platform, at the end of which was an open elevator shaft.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 177, 208; Dec. Dig. § 117.*]

2. MASTER AND SERVANT (§ 127*)—ELEVATOR SHAFTS—DUTY TO GUARD.

Failure to repair elevator doors designed to close the shaft or to stop a practice of the operators in blocking the doors so they would not close automatically was negligence toward other employés.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 252; Dec. Dig. § 127.*]

3. MASTER AND SERVANT (§ 106*)—ELEVATOR SHAFTS—LIABILITY FOR INJURY.

It is no defense to liability for injury to an employé who fell into an elevator shaft which was left open through failure of doors to close automatically that the elevator appliances were owned and maintained by another company; the elevator being leased and operated as part of the premises.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 193–198; Dec. Dig. § 106.*]

4. MASTER AND SERVANT (§ 227*)—INJURY TO EMPLOYÉ—CONTRIBUTORY NEGLIGENCE.

An employé injured by falling into an open elevator shaft cannot recover if he was guilty of contributory negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 668–672; Dec. Dig. § 227.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. MASTER AND SERVANT (§ 177*)—FELLOW SERVANTS—LIABILITY FOR NEGLIGENCE.

An employé who fell into an open elevator shaft cannot recover if his injury was due to a fellow servant's negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 307, 352, 357; Dec. Dig. § 177.*]

6. MASTER AND SERVANT (§ 265*)—CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF.

The burden is on an employer, sued for negligent injury, to show contributory negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–908, 955; Dec. Dig. § 265.*]

7. DAMAGES (§ 132*)—PERSONAL INJURY—EXCESSIVENESS.

Twelve thousand five hundred dollars is not excessive recovery for injury to a healthy laborer 36 years old, earning $1.80 a day and wages for overtime, resulting in a badly broken leg, involving two amputations, and crippling him for life.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 372–396; Dec. Dig. § 132.*]

Action by William H. Eichhorn against the Central Railroad of New Jersey. On defendant's motion for new trial. Motion overruled.

Motion by defendant to set aside the verdict of the jury and grant a new trial upon the grounds that same is contrary to the evidence, contrary to the law and the weight of evidence and also upon exceptions taken during the trial, and the further ground that the damages awarded by the jury are excessive.

Sydney A. Syme (L. F. Fish, of counsel), for the plaintiff.
De Forest Bros. (Robert Thorne, of counsel), for defendant.

RAY, District Judge. The defendant is a railroad corporation of the state of New Jersey. Prior to and on the 23d day of October, 1909, it occupied and used the westerly portion of the first and second floors of the Newark Warehouse in Newark, N. J., as a freight depot or place for loading and unloading its freight. Railroad tracks ran into this building at or near the southeast corner of the second story or floor, and diverged to the west. The building was quite large, and in the second story of the westerly end of the building there were three platforms connecting with a fourth platform. This fourth platform extended substantially the entire width of the building from north to south. Platform No. 1 extended from this fourth platform easterly, there being a railroad track on its northerly side. Platform No. 2 extended easterly from the fourth platform, and between it and platform No. 1 there were two railroad tracks. Platform No. 3 also extended easterly from this fourth platform, and between it and platform No. 2 there were two or more railroad tracks. These tracks between the platforms mentioned connected with the main tracks leading into the building. Loaded cars could be run in through the large door near the southeast corner of the building on the main track or tracks onto these other tracks between and by the side of platforms 1, 2, and 3. The tops of these platforms were substantially on a level with the platforms of the freight cars. The cars were run alongside the platforms

and unloaded by means of trucks or otherwise, and what freight was not left on the platforms temporarily was taken to elevators and lowered to the floor below. There were two elevators on each of the platforms, Nos. 1, 2, and 3. These elevators on each platform were located one near its westerly end and the other near its easterly end. Elevator 1 was near the westerly end of platform 1; elevator 2 near the westerly end of platform 2; elevator 3 near the westerly end of platform 3; elevator 4 near the easterly end of platform 3; elevator 5 near the easterly end of platform 2; and elevator 6 was near the easterly end of platform 1. This large room was lighted by means of electric lights depending from the ceiling; there being four or five lights at different points above each of the platforms 1, 2, and 3. There was a washroom at the westerly end of platform 1 at or near the northwest corner of this building on this floor. There was a ladder on the southerly side of each of these platforms not far from the easterly end, by means of which persons could go up from the tracks and spaces between and around them onto the platforms. On platform No. 1 Thomas or Tommy Warner, foreman of that floor, had a desk with an electric light at the desk. These elevator shafts were closed or solidly constructed on the easterly and southerly sides. They were open on the northerly and westerly sides, except when the elevator itself moving away from the platform automatically closed such openings by means of two solid doors at each opening, one moving up from the level of the platform and the other down from above. When the floor of the elevator arrived at the level of the platform, the man operating the elevator could open these doors by shoving down on the one and up on the other. When the elevator moved away, either up or down, the automatic device closed these doors. There was an arrangement by which these doors could be opened from the outside; that is, from the platform. This was the normal construction and the normal mode of operation. It is seen that if for any reason the automatic devices failed to work and close the doors into the elevator shaft when the elevator itself moved away, up or down, that these openings into the elevator shaft would be left open, and that a person going in or stepping in would be precipitated to the floor below.

There is no claim that the lights were insufficient in number or brilliancy when turned on, or that the platforms were improperly constructed or out of repair. There was a switchboard on platform 2 east of elevator No. 5. The lights above all the platforms could be turned off at one time, except that at Warner's desk, or the lights above each platform could be turned off without affecting the others. From the big door or doors at the southeast corner of the building where the cars came in a person could walk on the tracks or by the side of the tracks to platform No. 1, the most northerly one, or to platform No. 2, or to platform No. 3, then up the ladder and along the platform to the platform No. 4 (the one running north and south) and along it to the washroom, near which was a stairway leading out of the building, and this seems to have been the usual mode of egress after work had ceased. Of course, persons could go to the lower floor on the elevators before they ceased running. Work ceased at or a few minutes before 6 o'clock p. m., except when men worked overtime. There were

two gangs of truckers, three or four men in each gang, a checker with each. The duty of the checker was to note in a book the freight moved. The truckers, of course, moved the freight. There were at least two elevator men whose duty it was to operate the elevators. While this elevator No. 5, where the accident happened, was constructed and arranged to run to the top of the building, it ran to this second floor only, except on rare occasions. It was operated and controlled by the Railroad Company. It was kept in repair by the Warehouse Company, the owner of the building, but there is no evidence that the employés of the Railroad Company knew this fact.

From these facts, it is self-evident that in the daytime, or when the platforms were lighted up by means of those electric lights suspended about 15 feet above the platforms, a person walking along on the platforms would be able to see, if he used his senses, the openings into the elevator shafts, or any one of them, if near it, and would be on his guard except when at work. As the accident happened at elevator No. 5, the easterly one on platform No. 2, we will concern ourselves with that more especially. At 6 p. m. on the 23d day of October, 1909, or a few minutes before, work ceased on this floor, so far as the Railroad Company was concerned. The plaintiff, William H. Eichhorn, was a checker in the employ of the defendant company and had been at work on platform No. 2 and in the cars at that platform. When work stopped, he proceeded, as was his duty, to Warner's desk on platform No. 1 to turn in his checking sheets. While there one of the men, Andy Spengler, came to the desk and said, in substance, there was not help enough to close the big door when the cars came into the building on this floor, and the plaintiff said to Jack Steib, an employé, who was standing there, "Come, Jack, we will go over and give them a hand to close the doors." Steib said, "My men is over there, where is yours?" Plaintiff replied, "When I left, I told them to go over." Steib declined to go, as he did not get pay for overtime, but plaintiff said, "I will go over and see who is missing from my gang. I ain't going to have Larry give me any hell." And then Steib said, "All right, go over and give them a hand. It is only a minute's work." The plaintiff says this was in the presence of Warner, the foreman, from whom they took orders when "Larry" Wefferling, the superintendent, was not present, and that thereupon he proceeded to the big door in question to aid in closing it, or see that his gang was there and doing their duty. The plaintiff also testified:

"Q. Had Larry (referring to the superintendent) before this given you any orders to close them (the big doors), yes or no? A. Yes, sir.

"Q. State what those orders were, and when they were given you by Larry? A. About the 1st of October, around that time. I do not know the exact date, just a few weeks previous to that accident, the doors were left open. The next morning Larry called me out of my car over to where the other checker, Jack Steib, was, called us together and says: 'I want the checkers to see that all their men go over to close those doors at night, and not have some of them run away, so that the doors are left open because there are not men enough there, and to report to me all men that don't go over there and go home without going over to close the doors.'"

If this was true and the jury so found, then, under the circumstances, it was in the line of the plaintiff's duty to see to it that his gang were

at the big door to aid in closing it, and it was his duty to go and see and report if any were absent. He says he went to the washroom to see if any of his men were there, then along the platform No. 4 to No. 2, then along No. 2 and down to the tracks, and out to the big doors, which were about 100 feet from the easterly end of platform No. 2; that when he got there the door was closed, some men being there still; and that he and others then left to return to the place of egress at or near the washroom, and that he went back to platform No. 2 up the ladder, and started westerly on that platform towards platform No. 4. He says that the entire room, all the platforms, were lighted up during all this time, but that just about the time he started westerly on platform No. 2, after having gained it and taken two or three steps, the lights went out; that he called out, "What is the matter with the lights?" but got no answer, and then proceeded westerly on platform No. 2; that to get by this elevator No. 5 on that platform he turned to the right somewhat, and, it being dark and the doors of the elevator No. 5 being left open, he stepped into the open elevator shaft and was precipitated to the basement beneath, and that his leg was badly broken, and that he was compelled to undergo and did undergo two amputations of that limb, so that he is crippled and disabled for life. The defendant gave evidence that the orders to the checkers were that they must not have anything to do with the closing of these big doors, and contended that the plaintiff went to those doors, if he went, and to the place where he was when he fell, not only without orders, but in violation of orders, and that he was on business of his own, or a volunteer, after work had ceased, where he had no business to be at a time when the Railroad Company owed him no duty, and hence the Railroad Company was in no event liable. The jury was plainly and distinctly instructed that if the plaintiff went to that or those big doors at the time mentioned without orders, or in violation of orders, that he could in no event recover; that the defendant was not liable for his injuries.

The plaintiff based its cause of action on two grounds of negligence on the part of the Railroad Company, the defendant: First. Negligence in leaving the openings into this elevator No. 5 open while men were still in the building on or about these platforms engaged in the performance of their duty to the defendant company. Second. In turning off the lights while the men, especially the plaintiff, were still there on or about these platforms in the line of duty, and especially with these open doors into this elevator shaft. The jury was specially and distinctly instructed that, to enable plaintiff to recover, they must find that the defendant was negligent in both respects—that is, in having the doors into the elevator shaft No. 5 open—and, second, in turning off the lights while the plaintiff was still there engaged in the performance of a duty he owed the company or in promptly getting out of the building after such duty was performed, and leaving the plaintiff in darkness and exposed to peril which, without negligence on his part, was due to negligence on the part of the defendant company. Larry, the superintendent, also spoken of as the head foreman, was not present, but Tommy Warner, the foreman in control and from whom the men took orders, was. He knew that the plaintiff, with others, had

gone to close the big door, and, if the lights were turned off pursu-
ant to orders while the men or the plaintiff using due care and acting
expeditiously were getting back to the place of egress, the jury was jus-
tified in finding negligence in that regard, and, if the doors into the
elevator shaft were open by reason of the negligence of the defendant
company, then the plaintiff was injured by reason of the negligence of
the defendant in having the open elevator and in turning off the lights
leaving the employé to grope in the dark in that dangerous place, and
he was entitled to recover, provided he was not in fault himself. These
questions of negligence were submitted to the jury, and, as stated, it
was instructed that the defendant company must have been in fault—
negligent—in both respects in order for the plaintiff to recover. Evi-
dence was given that the orders were to turn off lights at 6 p. m. no
matter who was on the platforms. If occasion arose for the men or
any of them to remain later, and defendant knew it, it was the duty
of the defendant company to the men to see to it that the lights were
not turned off leaving them in darkness. The defendant company con-
trolled the lighting of the place. It was its duty to exercise due care
to keep it lighted so long as men were at work there and until they
had a reasonable opportunity to get out. It owed no duty to have the
elevator shafts closed when men were not present or not in or about
the platforms, but it did owe them a duty while rightfully there to have
them closed when the elevators were not at the second floor, as that
was their normal condition and what the men expected and had the
right to expect. If open then so long as employés were about them
in the line of duty, it was all the more the duty of the defendant to keep
the lights turned on. If left open after work ceased, it became a dan-
gerous place for any one moving about on that platform, especially in
the dark. Hence turning off the lights with a man on or about the
platform with those doors into the elevator shaft open was negligence.

Evidence was given tending to show that for a week before the
accident those doors into the shaft had not worked right; also, that
the elevator men and truck men had put in plugs to keep them from
closing when the elevator itself left that floor; that this was done to
save the slight labor of opening them when the elevator returned to
that floor; and that this was known to the defendant's superintendent
or foreman in charge. The plaintiff says that, when the lights were
turned out he called out, "What is the matter with the lights?" but
got no response. While there was a light at foreman Warner's desk
on platform No. 1, there was substantial evidence that there were
cars on the tracks between platform No. 1 and platform No. 2, so the
light could not shine on or into elevator No. 5, down which the plain-
tiff fell. The plaintiff testified that as he walked westerly on platform
2—that is, towards platform 4 running north and south—along which
he would proceed to the place of egress, after the lights were turned
out, he had his hands before him feeling his way, being unable to see;
that there was no elevator platform at that floor in this elevator shaft,
and he fell to the floor beneath. The plaintiff testified that the doors
into that shaft had failed to work three or four times during the
month preceding the accident, and that about eight days before the
accident George Schmidt, the elevator man, told Larry, the superin-

tendent or person in charge, "Them doors are not working again," and that Larry said, "All right, I will see that they get fixed." He also says another elevator man told Warner, the foreman, that the doors were not working again. There was other evidence that the elevator doors did not work, and that they were worked on for some hours the day after the accident. Whether open because out of repair, or because of being blocked open by the men going up and down with the knowledge of the defendant's superintendent or foreman on that floor, can make little difference. If open for the first cause, it was the duty of the defendant to see they were repaired, and, if for the second cause, it was the duty of the defendant to stop the practice. Workmen who took no part in blocking them open (and there was no evidence the plaintiff blocked them open) had the right to assume they were closed.

It appeared that the defendant intrusted the repairs of the elevators, the inspection, and keeping them in repair to the Warehouse Company, but it did not appear that the employés knew this. The plaintiff requested the court to charge, and the court charged on that subject as follows:

"Mr. Syme: There is only one request to which I would like to call your honor's attention, and that is in regard to the question of the Newark Warehouse Company having the duty of inspecting these doors and keeping them in repair, and I ask your honor to charge the jury in so far as the negligence of the defendant railroad company is concerned in this case it is immaterial as to whether the defendant or the Newark Warehouse Company were to inspect and keep the elevator doors properly working.

"The Court: It is entirely immaterial about that in regard to that. It was the duty of the railroad company toward its employés to have a reasonably safe place, and it was its duty to these employés to have those elevators in a reasonably safe condition so far as reasonable care on its part could do it, and the railroad company could not exonerate itself from liability in the discharge of that duty by leaving it to this warehouse company to perform. So far as it was left to the warehouse company to keep in repair and inspect and all that, it was as though the railroad company had intrusted it to some other person, and if the railroad company left it with them to do it, and it was negligently done and resulted in the injury, it is just the same as if the railroad· company had undertaken to do it itself and had failed in its duty."

The defendant's counsel requested the court to charge:

"I further ask your honor to charge the jury specifically that if the jury find that at the time the plaintiff left the large door to go home, went down the platform, if at the time the plaintiff left the large door and was approaching the platforms to go home to go down to the other end of the building, that the lights were then out on platform No. 2, but there were lights burning on No. 1, that it was his duty to go down platform No. 1, and if the accident occurred by reason of his taking the dark way when there was a light way to go, he himself is responsible, and cannot recover from the defendant."

To this the court said:

"The Court: That depends upon where he was, gentlemen. If he had gotten up to some place where it was dark, and he could see there were lights on platform No. 1, that it was a lighter and better and safer way to go, then it was his duty to go that way, and if he chose a dark way instead of a light and safe place where he could see, of course, then it would be his own fault or negligence. He was not justified in going into a dark and dangerous place when he had a light safe place to go. He was bound to exercise his senses. I cannot say as a matter of law, gentlemen, he was bound to take No. 1 or

No. 2, but under the evidence in this case given by the plaintiff he had a right to take the other platform. You may find, not as a matter of law I don't say, under that evidence you may find something which justified him. It is for you to say.

"Mr. Thorne: Your honor will allow me an exception to the refusal to charge as requested?

"The Court: I understood you to ask me to charge under the evidence in this case it was absolutely his duty to have gone out to No. 1 and down No. 1 to the point of egress.

"Mr. Thorne: No, sir; I did not.

"The Court: What was your request?

"Mr. Thorne: I asked your honor to charge this jury if at the time the plaintiff was leaving the large door to go home which he had just helped to close, if at the time the plaintiff was leaving the large door to go home, if at that time the platforms 2 and 3 were dark and there were some lights on platform 1, it was his duty to go down the platform No. 1, and if he did not go on platform No. 1, but, on the contrary, he took a dark one, it was negligence, and he cannot recover.

"The Court: Gentlemen, there might have been a tallow candle. If there was some little electric light on the desk in the distance, that would be one thing. If it was light enough, as some of the defendant's witnesses say, lighted up in that way with four or five electric lights, then, of course, it would have been his plain duty, provided the others were dark, to go to No. 1. It is as I have said, but I refuse to charge in that exact language, but I do charge it in the way I have stated it. If there was some little light in the distance which did not light his pathway and one course was as safe as the other, then, of course, he could take either. It was his duty in exercising his senses and his sight to take a safe path or the safer path if there was any."

## The defendant's counsel also requested the court to charge:

"I ask your honor to charge, if the jury find upon the Saturday of this accident the elevator doors were in good working order except for an occasional failure to work due to the blocking or chocking by the men themselves, that the defendant in that case would not be chargeable with any negligence for a defective condition of the doors, if such were the fact, on that night when the plaintiff was injured."

## The court charged:

"The Court: You force upon me now another proposition in this case which I had left untouched, and which I will now proceed to charge the jury. Gentlemen, the running of these elevators was in the hands of the elevator men who have been spoken of, elevator men who seem to have had charge of it generally. Of course, there has been some expression from some of the witnesses which might show in this case that other than regular elevator men sometimes operated them. I have been uncertain in my mind by reason of the expressions which they have made whether they ever did it or not; but almost invariably these elevator men ran the elevators, had charge of them. They were intrusted with that duty by the defendant company. The defendant company had them there for that purpose. Now, gentlemen, if the defendant company knew through its superintendent and through its assistant superintendent that these men were chucking in blocks to prevent those doors closing and leaving them open, that that was being done by the elevator men, if it was not done by this plaintiff and he did not understand it and know of it and participate in it, if that was being done and the superintendent knew it, learned of it, the foreman and assistant foreman, those in charge there knew of it, then it was knowledge on the part of the defendant company, and it would be negligence on its part, so far as its dealings with others were concerned. It would be negligence on its part to permit that to go on. It would be its duty to see to it that it was stopped and to see to it that men who repeatedly and continually did that or permitted that to be done were discharged, because you can see it would be unsafe to everybody in the room moving about there to have those doors blocked open and left open when it was intended that they should be closed. Unless, of course, the plaintiff knew

of it, knew that they were open, knew that that was the custom, why, then, of course, he would take the risk, because knowing the facts he would be there taking the risk of their being open. That is what I charge you on that subject.

"Mr. Thorne: I take an exception to your honor's refusal to charge as requested. I ask your honor to charge the jury if they believe from all the evidence in the case at the time of the accident the doors were held open by a block or chock which had been put there by a fellow servant of the plaintiff the defendant then is not liable.

"The Court: That would be true unless, as I have stated, it was there by and through the fault of the company itself in permitting that to be done from time to time, allowing it to be done in that way. If it was done with its assent and this plaintiff did not know of it, relied upon its being closed, as it was intended by the construction of the elevators it should be, if he had reason to suppose it was closed when he moved along there and some employé had blocked it open and the defendant company had permitted it to be done, allowed it to be done without stopping it, then you can base negligence upon that and that the open door would be the result of the negligence of the company itself.

"Mr. Thorne: I except to your honor's charge and to the refusal to charge as requested. I ask your honor to charge that even if these doors were blocked open often and repeatedly by the servants, fellow servants of this plaintiff, and even though the defendant knew of it, if this plaintiff also knew of those conditions, he will be held to have assumed any risk of damage resulting from that.

"The Court: I have already charged that and I charge it again."

I discover no serious or prejudicial error in this charge. The jury had been instructed that the defendant company must have been negligent in leaving or having the doors open and the lights out when men were on or about the platforms engaged in the performance of their duty to the Railroad Company. That negligence in having them open would consist in failure to keep them in repair so they would work, and that failure to work must have continued for such a length of time that the defendant company would be presumed to have notice. The defendant then forced the proposition of employés blocking the doors open. It seems to me clear that, even if the doors were in such condition that they worked all right the afternoon of the accident, except as blocked open, if blocking open was a custom persisted in by employés and not stopped by the defendant, and blocking open caused the doors to be open the night of the accident, the jury was authorized to find negligence on the part of the defendant. The open doors of the elevator may have been due to negligence of the defendant in either of two respects: One, failure to repair knowing them to be out of repair; and, two, failure to see to it that they were not blocked open and left open having knowledge of a custom of blocking them open. Hence, if blocked open and left in that condition by the negligence of the company in failing to see they were not blocked open, it was no excuse that they were in good working condition but for such blocking, provided, of course, the plaintiff took no part in such blocking. If he did, the jury was told he could not recover. I am not able to see that the court made any comment or comments on the evidence. The jury was expressly told they were sole judges of the facts, and must not think the court in any way had or expressed an opinion. The jury was also cautioned against prejudice against corporations, &c. It was no defense that the elevator appliances were owned by the

Newark Warehouse Company, and that it saw to keeping them in repair. The elevator in question was operated by the defendant, and it was its duty to its employés to see to it that it was in order as there is no evidence they knew it was owned or repaired or kept in running order by the Newark Company. The evidence showed conclusively that the defendant leased and used and operated the elevators with the whole western end of the second floor. This question has just been decided by the Circuit Court of Appeals in this circuit (Second Circuit; Lacombe, Coxe, and Ward). Dunn et al., as Receivers, v. Cavanaugh (decided February 14, 1911, not yet officially reported) 185 Fed. 451. The court said and held:

"Exceptions were also taken to the charge, only one of which we think it necessary to mention, viz., that it was error in the court to charge the jury that it was the duty of the defendants to make the premises where the decedent worked reasonably safe. This is a correct statement of the duty of the owner or occupier of real estate as to persons whom he invites to work there. It is only in the case of mere licensees that he is held to no active duty as to the condition of the premises. Judgment affirmed."

It is unnecessary to cite the numerous authorities on this point. If a corporation leases the whole or part of a building and occupies it and operates the elevators therein, and hires men and puts them to work there without notice that the owner and not the lessee keeps it in repair and a safe condition and is responsible therefor, it cannot escape liability for negligence in not keeping the place in a reasonably safe condition for its employés by showing the owner agreed to keep and was charged with the duty of keeping the elevators in good and safe condition and repair. To hold that liability is avoided in such case would abrogate the rule in the case of lessees that the master is bound to exercise reasonable care to provide a reasonably safe place in which the servant is to work.

The plaintiff could not recover if he was guilty of contributory negligence, or if his injury was due to the negligence of a fellow servant. But there was substantial evidence that the plaintiff was in the line of his duty to the company; that with all the lights on he had reached and was on platform No. 2, proceeding with diligence and care to the place of egress; that the lights were turned off pursuant to inflexible orders of the defendant; that he called for light and got no response; that he then proceeded feeling his way and fell into the open shaft, left open by the negligence of the defendant. The question of his contributory negligence was left to the jury fairly. The court was more favorable to the defendant than it should have been. It said:

"In order to recover here, he (the plaintiff) must show freedom from negligence and that he did not go recklessly into a dangerous place and get hurt, go where he had no right to be, and, if he got hurt in that way, this defendant is not liable."

This, in effect, placed the burden of showing freedom from contributory negligence on the plaintiff, when, in fact, the burden was on defendant to show contributory negligence. The jury was also instructed repeatedly that the defendant must have been negligent in both respects referred to, and that its negligence must have been the proximate cause of the injury. The jury was also told that the plaintiff

assumed all the known and ordinary risks of the employment but not those of the negligence of the defendant itself, and that, if the injury was received through the negligence of the defendant combined and operating with that of a coemployé, the plaintiff might recover.

As to the damages, I think it cannot be said they were excessive. The plaintiff, a laboring man 36 years of age and married, was in good health before the accident. His leg was badly broken and amputated twice. He was earning about $1.80 per day and additional wages for overtime. He is a cripple for life, and will be unable to earn much aside from what he can do with his hands. In a recent case —Gagnon v. Clauder Weldon, etc. (C. C.) 174 Fed. 477—the plaintiff lost a part of his hand, but was able to use it, and the evidence showed he was earning as much wages as he did before the accident. This court reduced the damages awarded by the jury $3,500 to $2,500 and denied a new trial. The Circuit Court of Appeals in affirming the judgment said that the damages before the reduction were not excessive. If $3,500 was not excessive in that case, $12,500 is not excessive in this.

The motion to set aside the verdict and grant a new trial is denied.